Robert WRITT, Appellant

v.

**SHELL OIL COMPANY and Shell International, E & P, Inc., Appellees.**

No. 01–11–00201–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 25, 2013.

---

Kenneth D. Hughes, The Huges Law Firm, Robert Dubose, Alexander Dubose & Townsend LLP, Houston, TX, for Appellant.

Macey Reasoner Stokes, Baker Botts, L.L.P., James Edward Maloney, Andrews Kurth LLP, Tracy Nicole Leroy, Sidley Austin LLP, Houston, TX, for Appellees.

Panel consists of Justices JENNINGS, SHARP, and BROWN.

## OPINION

TERRY JENNINGS, Justice.

Appellant, Robert Writt, challenges the trial court's rendition of summary judgment in favor of appellees, Shell Oil Company and Shell International, E & P, Inc. (collectively, "Shell"), in Writt's suit against Shell for defamation. In two issues, Writt contends that the trial court erred in granting Shell summary judgment as Shell did not have an "absolute privilege," or "immunity," to make defamatory statements about him to the United States Department of Justice ("DOJ"), he presented evidence of the damages caused by Shell's defamation, and damages are presumed as a matter of law on his claim for defamation per se.[1]

### Introduction

Because the absolute privilege could possibly be used improperly as a sword, rather than properly as a shield, Texas courts and the Restatement of the Law on Torts have long distinguished between it, for communications made during judicial and quasi-judicial proceedings, and the qualified, or conditional, privilege, for communications made in the public interest.[2] To extend the absolute privilege to the circumstances of the instant case, where neither Shell nor Writt was a party to an ongoing or proposed judicial or quasi-judicial proceeding at the time that Shell made the complained-of statements, would have the very dangerous effect of actually discouraging parties from being truthful with law-enforcement agencies and instead encourage them to deflect blame to others without fear of consequence.

The "immunity" conferred by the absolute privilege attaches only to a "select number of situations which involve the administration of the functions of the branches of government, such as statements made during legislative and judicial proceedings."[3] And a defendant is entitled to summary judgment on the basis of the absolute privilege only if the evidence conclusively proves the privilege's application.[4]

Here, as detailed below, Shell presented summary-judgment evidence that the DOJ requested a forty-five minute meeting with Shell to discuss its business dealings with another company. And, during the meeting, Shell, according to the DOJ, agreed to "voluntarily investigate its business dealings" with the company and provide the

---

1. Shell has filed a motion for en banc reconsideration. *See* Tex.R.App. P. 49.7. The panel withdraws its February 14, 2013 opinions and substitutes these opinions in their place.

2. *See, e.g., Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 768 (Tex.1987); Restatement (Second) of Torts §§ 585–591 (1977) (discuss-

ing application of absolute privilege); *id.* § 598 (discussing application of qualified, or conditional, privilege).

3. *Hurlbut,* 749 S.W.2d at 768.

4. *Id.*

DOJ with certain documents and Shell's "proposed investigative plan." Eighteen months later, Shell provided its investigative report, which contains the complained-of statements about Writt, to the DOJ. As noted by Shell, it was not until twenty months after it had given the investigative report to the DOJ that the DOJ first "open[ed] a judicial proceeding and file[d] a criminal information" against Shell. There simply is no evidence that a criminal case had been filed against Writt or Shell, or that a criminal prosecution was actually being proposed against either Writt or Shell, at either the time the DOJ first contacted Shell or when Shell submitted its report to the DOJ. Thus, we conclude that the summary-judgment evidence does not conclusively establish the applicability of the absolute privilege to the complained-of statements made by Shell in its voluntarily-made investigative report to the DOJ.[5]

However, given that a "sufficiently important public interest" may have "require[d]" that Shell make the communication to the DOJ, whether solicited by the DOJ or not, "to take action if the defamatory matter [were] true," we conclude that Shell enjoys the adequate protection of the conditional privilege as a "Communication to One Who May Act in the Public Inter-est."[6] As noted below, the conditional privilege is "applicable when any recognized interest of the public is in danger, *including the interest in the prevention of crime and the apprehension of criminals*, the interest in the honest discharge of their duties by public officers, and the interest in obtaining legislative relief from socially recognized evils."[7]

█ Accordingly, we reverse the judgment of the trial court and remand for proceedings consistent with this opinion.[8]

## Background

In his petition, Writt alleges that, as an employee of Shell, he was charged with the responsibility of approving payments to contractors on certain Shell projects in foreign countries, including Nigeria. During the course of his work, Writt learned that certain Shell contractors were under investigation "by various governmental agencies" for making and receiving illegal payments and one of Shell's vendors had pleaded guilty to violating the Foreign Corrupt Practices Act ("FCPA").[9] Writt further alleged that, in response to an informal inquiry to Shell from the DOJ, Shell had "voluntarily" submitted to the DOJ a report in which Shell "falsely accused him" of "engaging

---

5. *See id.*

6. *See* Restatement (Second) of Torts § 598 (1977).

7. *Id.* § 598 cmt. d (emphasis added).

8. Shell also sought summary judgment on Writt's defamation claim on the ground that Writt presented no evidence of his damages. However, after Shell filed its summary-judgment motion, Writt amended his petition to include a claim for defamation per se. Shell did not file an additional or amended summary-judgment motion to attack Writt's defamation per se claim or the alleged damages arising therefrom. As Shell recognizes in its appellees' brief, damages for a claim for defa-mation per se are presumed as a matter of law. *See Knox v. Taylor*, 992 S.W.2d 40, 60 (Tex.App.-Houston [14th Dist.] 1999, no pet.) ("In the recovery on a claim of defamation per se, the law presumes actual damages and no independent proof of damages to reputa-tion or of mental anguish is required."). Because Writt amended his petition after Shell filed its summary-judgment motion and Shell did not separately attack the damages element of Writt's defamation per se claim, Shell, as stated in its appellees' brief, has not ad-dressed the damages issue on appeal.

9. *See* 15 U.S.C. § 78dd–1 (2004).

in unethical conduct" in connection with the payment of "bribes" and providing inconsistent statements during multiple interviews conducted by Shell as part of its internal investigation. Writt asserted a claim for defamation[10] against Shell for the allegedly false statements contained in its report to the DOJ. Specifically, Writt alleged that Shell, in its report, falsely stated that he had been involved in illegal conduct in a Shell Nigerian project by recommending that Shell reimburse contractor payments he knew to be bribes and failing to report illegal contractor conduct of which he was aware.

In its summary-judgment motion, Shell argued that because the statements made in its report to the DOJ were "absolutely privileged," they could not give rise to a defamation claim. Shell asserted that federal regulations authorize the DOJ to prosecute violations of the FCPA,[11] it "agreed with the DOJ to undertake the internal investigation," it furnished the report to the DOJ "with the understanding that the facts in the report would be used by the DOJ in determining whether or not to prosecute Shell for FCPA violations," and the report related to the DOJ investigation.

In support of its summary-judgment motion, Shell attached a copy of a July 3, 2007 letter from Mark Mendelsohn of the Fraud Section of the DOJ's Criminal Division to Shell. In his letter, Mendelsohn stated in pertinent part:

It has come to our attention that [Shell] has engaged the services of Panalpina, Inc. ("Panalpina")[ [12]] to provide freight forwarding and other services in the United States and abroad, and that certain of those services may violate the [FCPA]. *The purpose of this letter is to request a meeting with you to further discuss Shell's engagement of Panalpina. We anticipate this initial meeting will not take longer than 45 minutes.*

(Emphasis added.) Mendelsohn also made a "request" that, in advance of the meeting, Shell "prepare and provide the Fraud Section a spreadsheet detailing in what countries Shell has used the services of Panalpina" and "the total amount of payments for such services for the past five years."

Shell also attached to its motion the affidavit of Michael Fredette, Shell's Managing Counsel, who testified that, after receiving Mendelsohn's letter, Shell representatives met with the DOJ and Shell "agreed to conduct *an internal investigation* into its dealings with Panalpina." (Emphasis added.) Fredette further testified:

I was one of the leaders of *Shell's internal investigation.* The investigative team was comprised of members of the Shell Legal Department and Shell's Business Integrity Department, and assisted by outside counsel from Vinson & Elkins LLP and forensic accountants from KPMG LLP.

Shell's Business Integrity Department is staffed with attorneys and former law enforcement officers, including former Federal Bureau of Investigation agents.

---

10. Writt also asserted a claim against Shell for wrongful termination of his employment, but Writt has not appealed the trial court's adverse judgment entered on the claim after a jury trial.

11. *See* 28 C.F.R. § 0.55(m)(4) (assigning enforcement of FCPA to Assistant Attorney General, Criminal Division of DOJ).

12. The record reflects that the DOJ had been investigating Panalpina for a significant period of time prior to contacting Shell. The record also reflects that in February 2007, Shell's contractor, Vetco Gray, pleaded guilty to violating the FCPA in connection with payments made through Panalpina.

The *internal investigation* began in August 2007, *and culminated in a written report submitted to the [DOJ] on or about February 5, 2009.* Shell submitted the report to the [DOJ] with the understanding that the report would be treated confidentially.

Shell agreed to conduct the *internal investigation* with the understanding that *it would ultimately report its finding to the [DOJ] and that the [DOJ] would conduct its own investigation for possible violations of the [FCPA] and other laws by Shell and/or its employees.*

(Emphasis added.)

Additionally, Shell attached to its summary-judgment motion a July 17, 2007 letter from Stacey K. Luck of the DOJ's Fraud Section to Shell's legal counsel, C. Michael Buxton of Vinson & Elkins LLP. In the letter, Luck stated in pertinent part:

Thank you and your client, [Shell], for meeting with us today. As discussed, *it is our understanding that Shell intends to voluntarily investigate its business dealings* with Panalpina Inc. and all other Panalpina subsidiaries and affiliates (collectively referred to as "Panalpina").

(Emphasis added.) Luck requested that "in conducting the investigation," Shell produce certain documents and information pertaining to the time period of June 2002 through June 2007. Luck also specifically requested that "[p]rior to initiating your investigation" and the production of any documents, Shell provide the current location of a number of individuals, including Writt, who had been associated with a Shell project in Nigeria from January 1, 2004 to December 31, 2005. And Luck requested Shell's "proposed investigative plan," including the "estimated volume of documents implicated," "number of individuals to be interviewed," and "proposed duration of the investigation."

Finally, we note that Shell also attached to its motion, among other documents, a copy of a September 4, 2008 Vinson & Elkins memorandum regarding an "Overview on Robert Writt" and the February 5, 2009 investigative report that Shell had provided to the DOJ. In the report submitted to the DOJ, Shell set forth the basic background facts of the investigation, explained that the DOJ had contacted Shell and met with its representatives regarding allegations of criminal violations, and noted that Shell had "agreed to conduct an internal investigation" and "work with the DOJ to establish an investigative plan." It also noted that the DOJ had requested that Shell "produce ten categories of documents and other information in connection with its investigation." Shell then made findings and recommendations to deter future "potential violations" of Shell's business principles, recommended disciplinary action for "certain staff," and noted that the "investigation team" had identified "certain individuals to the relevant Shell managers for consequence management." Shell also included in the report specific references to Writt, discussed his conduct in relation to Shell's dealings with its contractors, and detailed the information that Writt had provided during Shell's investigation.

In his response to Shell's summary-judgment motion, Writt asserted that Shell, in its report to the DOJ, had falsely described him as a major participant in illegal conduct. Citing Shell's report, Writt noted that he had informed Shell that he had suspected certain illegal activity and had objected to Shell reimbursing certain vendors for illegal payments. Nevertheless, Shell informed the DOJ that Writt had approved payment of certain bribes, had denied suspecting that bribery was occurring, and had failed to take action to stop the bribery on seventeen sepa-

rate occasions. Further citing Shell's report to the DOJ, Writt also complained that Shell informed the DOJ that he had provided inconsistent statements during his interviews. Writt argued that because, under Texas law, "[s]tatements made to prosecutorial agencies like the DOJ receive at most a qualified privilege," Shell was not entitled to summary judgment on the ground that it enjoyed an "absolute privilege" to make the statements. In addition to the report, Writt attached to his response his deposition and affidavit testimony. In his testimony, Writt explained that he had been suspicious of certain payments made by a Shell contractor beginning in 2004, he subsequently learned that one of Shell's contractors had pleaded guilty in February 2007 to FCPA violations, and he had notified Shell personnel about an internal investigation being conducted by the contractor and the contractor's subsequent guilty plea to FCPA violations.

In its reply, Shell noted that on November 4, 2010, twenty months after it had provided its investigative report to the DOJ, the DOJ "open[ed] a judicial proceeding and file[d] a criminal information [against Shell] based at least in part on the information provided by Shell in the course of the investigation." Shell then entered into a Deferred Prosecution Agreement with the DOJ, and it attached a copy of the agreement to its reply. In the agreement, the DOJ noted that Shell had cooperated in its investigation and agreed to continue cooperating in any ongoing investigation. Shell also agreed to the payment of a monetary penalty.

## Standard of Review

To prevail on a summary-judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and there is no genuine issue of material fact. Tex.R. Civ. P. 166a(c); *Cathey v. Booth,* 900 S.W.2d 339, 341 (Tex. 1995). When a defendant moves for summary judgment, it must either (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey,* 900 S.W.2d at 341. When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). Every reasonable inference must be indulged in favor of the non-movant and any doubts must be resolved in his favor. *Id.* at 549.

■ Here, the parties dispute whether Shell's claim of absolute privilege is properly characterized as a defense or an affirmative defense for which Shell had the burden of proof. *Compare Clark v. Jenkins,* 248 S.W.3d 418, 433 (Tex.App.-Amarillo 2008, pet. denied) (stating that absolute privilege is "affirmative defense to be proved"), *with CEDA Corp. v. City of Houston,* 817 S.W.2d 846, 849 (Tex.App.-Houston [1st Dist.] 1991, writ denied) (citing *Reagan v. Guardian Life Ins. Co.,* 140 Tex. 105, 166 S.W.2d 909, 913 (1942)) (stating that "absolute privilege is not a defense" and that "absolutely privileged communications are not actionable."). Regardless of the different characterizations of the absolute privilege in Texas, a defendant is entitled to summary judgment on the basis of absolute privilege only if the evidence conclusively proves the privilege's application. *See Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 768 (Tex.1987) (holding that evidence did not conclusively establish application of absolute privilege); *see also Thomas v. Bracey,* 940 S.W.2d 340, 343 (Tex.App.-San Antonio 1997, no writ) ("Whether an alleged

defamatory matter is related to a proposed or existing judicial proceeding is a question of law to be determined by the court.").

## Absolute Privilege

In his first issue, Writt argues that the trial court erred in granting summary judgment in favor of Shell because Shell did not have an absolute privilege to make defamatory statements about him in its report to the DOJ. Writt asserts that there is "no summary judgment evidence that the DOJ had initiated any legal proceedings against Shell" at the time that it made the defamatory statements in its report.

■■■ "An absolutely privileged communication is one for which, by reason of the occasion upon which it was made, no remedy exists in a civil action for libel or slander." *Reagan*, 166 S.W.2d at 912. When the absolute privilege applies to a communication, there is no action in damages, "and this is true even though the language is false and uttered or published with express malice." *Id.; see also Hurlbut*, 749 S.W.2d at 768 (stating that when absolute privilege applies, "the actor's motivation is irrelevant" and privilege is "not conditioned upon the honest and reasonable belief that the defamatory matter is true or upon the absence of ill will on the part of the actor"). Thus, the absolute privilege may be properly characterized "as an immunity." *Hurlbut*, 749 S.W.2d at 768.

The absolute privilege, or immunity, is "based chiefly upon a recognition of the necessity that certain persons, because of their special position or status, should be as free as possible from fear that their actions in that position might have an adverse effect upon their own personal interests." RESTATEMENT (SECOND) OF TORTS ch. 25, title B, intro. note (1977). To accom-

plish this end, "it is necessary for them to be protected not only from civil liability but also from the danger of even an unsuccessful civil action." *Id.* Under the Restatement, these persons include "Judicial Officers," "Attorneys at Law," "Parties to Judicial Proceedings," *"Witnesses in Judicial Proceedings,"* "Jurors," "Legislators," *"Witnesses in Legislative Proceedings"* and "Executive and Administrative Officers." *Id.* §§ 585–591 (emphasis added).

■■■ In contrast, the "qualified," or "conditional," privilege concerning communications may be defeated when it is abused, i.e., when the "person making the defamatory statement knows the matter to be false or does not act for the purpose of protecting the interest for which the privilege exists." *Hurlbut*, 749 S.W.2d at 768. The distinction between the absolute privilege and the conditional, or qualified, privilege is that "an absolute privilege confers immunity regardless of motive whereas a conditional privilege may be lost if the actions of the defendant are motivated by malice." *Id.*

■■■ The conditional privilege *"arises[s] out of the particular occasion* upon which the defamation is published" and is "based upon a public policy that recognizes that it is desirable that *true information* be given whenever it is reasonably necessary for the protection of the actor's own interests, the interests of a third person, or *certain interests of the public."* RESTATEMENT (SECOND) OF TORTS ch. 25, title B, intro. note (emphasis added). As noted in the Restatement:

> In order that this information may be freely given it is necessary to protect from liability those who, for the purpose of furthering the interest in question, give information which, without their knowledge or reckless disregard as to its falsity, is in fact untrue.

*Id.* The conditional privilege, which protects an actor from liability, but not civil action, for providing information the actor believes to be true applies to a "Communication to One Who May Act in the Public Interest." *Id.* at § 598.

 Texas recognizes that the "immunity" conferred by the absolute privilege attaches only to a "select number of situations which involve the administration of the functions of the branches of government, such as statements made during legislative and judicial proceedings." *Hurlbut,* 749 S.W.2d at 768. The Texas Supreme Court has explained that communications made "in the due course of a judicial proceeding" are absolutely privileged, and this privilege "extends to any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case." *James v. Brown,* 637 S.W.2d 914, 916–17 (Tex.1982). Additionally, the application of the absolute privilege to communications made in the course of judicial proceedings has been extended to apply "to proceedings before executive officers, and boards and commissions which exercise quasi-judicial powers."[13] *Reagan,* 166

---

13. Our dissenting colleague would have this Court be the first appellate court in the nation to characterize the DOJ as acting in a quasi-judicial capacity by engaging in its law-enforcement duties. He would further hold that the DOJ initiated its own "quasi-judicial proceeding" simply by approaching and communicating about a potential criminal matter with Shell. Here, as noted by Shell, the DOJ ultimately did "open a judicial proceeding and file a criminal information" against Shell, and Shell then entered into a Deferred Prosecution Agreement with the DOJ. It seems rather odd to characterize the DOJ as engaging in a "quasi-judicial proceeding" for its prosecutorial actions taken prior to its opening of an actual judicial proceeding against Shell by the filing of a criminal information against Shell. Such a characterization fails to recognize the distinct role of prosecutors and judges in our criminal justice system. Regardless, our colleague would rely upon such a characterization to extend absolute immunity for communications made to the DOJ by a potential witness and/or a potential criminal defendant preliminary to an actual judicial proceeding.

In support of his position, our dissenting colleague asserts that the DOJ "satisfies most of the elements of quasi-judicial power," citing *Parker v. Holbrook,* 647 S.W.2d 692 (Tex.App.-Houston [1st Dist.] 1982, writ ref'd n.r.e.).

However, this Court in *Parker* did not, as suggested by our colleague, broadly articulate a test for determining whether any "governmental entity" exercising certain powers functions in a quasi-judicial capacity. Rather, emphasizing that "the class of absolute privileges has traditionally *been very limited,*" we noted that although, "[o]riginally, only those proceedings that were of a judicial nature were deemed to warrant the protection of an absolute privilege," the protection was later "expanded *to include some proceedings held before administrative agencies or commissions that were of a judicial nature* and warranted the protection." *Id.* at 695 (emphasis added). We then simply noted that *"[t]hese judicial powers exercised by administrative agencies* have been described as quasi-judicial powers, encompassing the notion that they are exercised by non-judicial agencies." *Id.* (emphasis added). Given this context, we then explained that,

At least six powers have been delineated as comprising the judicial function and would be indicative of *whether a commission was acting in a quasi-judicial, or merely an administrative, capacity:* 1) the power to exercise judgment and discretion; 2) the power to hear and determine or to ascertain facts and decide; 3) the power to make binding orders and judgments; 4) the power to affect the personal or property rights of private persons; 5) the power to examine witnesses, to compel the attendance of witnesses, and to hear the litigation of issues on a hearing; and 6) the power to enforce decisions or impose penalties.

*Id.* (emphasis added). We concluded that "[a]n administrative agency need not have

S.W.2d at 912. However, "[a]ll communications to public officials are not absolutely privileged." *Hurlbut*, 749 S.W.2d at 768 (citing *Zarate v. Cortinas*, 553 S.W.2d 652 (Tex.Civ.App.-Corpus Christi 1977, no writ)).

In defining the scope of communications to which the absolute privilege applies, the Texas Supreme Court has referred to relevant provisions in the Restatement (Second) of Torts. *Id.* (citing RESTATEMENT (SECOND) OF TORTS §§ 583–612 (1977)). For example, in *James*, the court considered the appropriate privilege to apply to a psychiatrist's statements referenced in reports that were filed with a probate court. 637 S.W.2d at 917. The court considered the application of Restatement section 588, entitled "Witnesses in Judicial Proceedings," which provides:

> A witness is *absolutely privileged* to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding.

*James*, 637 S.W.2d at 917 (quoting RESTATEMENT (SECOND) OF TORTS § 588 (1981)) (emphasis added). Noting that the "administration of justice requires full disclosure from witnesses, unhampered by fear of retaliatory suits for defamation," the court held that the absolute privilege applied to the psychiatrist's reports as well as a letter written by an attorney in the case that was deemed written "in contemplation" of the judicial proceeding. *Id.*

More recently, the supreme court considered the appropriate privilege to apply to statements made by an insurance agency's representative to an assistant attorney general who had been assigned to investigate a group health insurance program being sold by the agency. *Hurlbut*, 749 S.W.2d at 768. The court considered both

all of the above powers to be considered quasi-judicial, but certainly the more of these powers it has, the more clearly is it quasi-judicial in the exercise of its powers." *Id.* And we ultimately held that a hearing conducted by the executive committee of the Houston–Galveston Area Council, a regional planning agency of the state designated by the governor, was "not quasi-judicial in nature." *Id.* at 696.

This Court in *Parker* did not, and it has never, intimated that the protection of the absolute privilege extends to communications made to any governmental entity other than an administrative agency or commission, and then only in proceedings of a judicial nature. Indeed, a review of the reasons supporting both the absolute privilege and the conditional privilege reveals that there is no sound public policy reason to extend the absolute privilege to communications other than those made in a proceeding of a judicial nature held before administrative agencies or commissions. Because they are in basically the same position, it makes sense to recognize that a witness appearing in a proceeding of a judicial nature in front of an administrative agency or commission should be protected from a lawsuit as is a witness in a judicial proceeding. However, it makes no sense to grant the same absolute immunity from a lawsuit for communications made by an individual or an entity that may or may not be a witness some day in the future, especially if that individual or entity may or may not be a criminal defendant. To grant such an individual or entity—one that has a strong motive to deflect blame—immunity would more effectively discourage, rather than encourage, truth-telling, especially in a law-enforcement context.

As revealed below, the communication made by Shell to the DOJ regarding Writt was in the nature of a "Communication to One Who May Act in the Public Interest" under Restatement section 598. As such, given that a "sufficiently important public interest" may have "require[d]" that Shell make the communication to the DOJ, whether solicited by the DOJ or not, "to take action if the defamatory matter [were] true," Shell enjoys the adequate protection of the conditional privilege, not absolute immunity. *See* RESTATEMENT (SECOND) OF TORTS § 598.

Restatement sections 588 and 598, which is entitled "Communication to One Who May Act in the Public Interest." *Id.* at 767–78. Section 598 provides,

An occasion makes a publication *conditionally privileged* if the circumstances induce a correct or reasonable belief that

(a) there is information that affects a sufficiently important public interest, and

(b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true.

RESTATEMENT (SECOND) OF TORTS § 598 (emphasis added) (quoted in *Hurlbut,* 749 S.W.2d at 768). Noting that the evidence before it did not conclusively establish that the allegedly defamatory statements were made to a public official or were made in the course of a judicial or quasi-judicial proceeding, the court held that the agency's communications to the assistant attorney general were "best analogized to the conditional privilege" set forth in section 598 and, thus, the statements were not absolutely privileged. *Hurlbut,* 749 S.W.2d at 768.

Texas courts of appeals have also addressed the application of the absolute and conditional privileges to various communications. In *Zarate,* the Corpus Christi Court of Appeals considered the appropriate privilege to apply to allegedly slanderous statements made in a criminal complaint filed with a local sheriff's office. 553 S.W.2d at 654. The court acknowledged that communications published in the course of a judicial proceeding are absolutely privileged and the privilege for such statements extends to "proceedings before executive officers, boards or commissions which exercise quasi-judicial powers." *Id.*

at 655. Analyzing the facts before it, the court determined that only a qualified privilege applied to communications "of alleged wrongful acts to an official authorized to protect the public from such acts." *Id.* The court acknowledged that "strong public policy consideration[s]" dictate that communications like the criminal complaint before it "be given some privilege against civil prosecution for defamation" and it is "vital to our system of criminal justice that citizens be allowed to communicate to peace officers the alleged wrongful acts of others without fear of civil action for *honest mistakes.*" *Id.* (emphasis added). But the court concluded that such communications did not fall "within the traditional areas of absolutely privileged communications" recognized in Texas. *Id.* The court further noted that applying the absolute privilege under the circumstances before it "would unnecessarily deny those innocent victims of *maliciously or recklessly* filed complaints an opportunity to seek remuneration for their injury." *Id.* (emphasis added); *see also Vista Chevrolet, Inc. v. Barron,* 698 S.W.2d 435, 436 (Tex.App.-Corpus Christi 1985, no writ) (holding that only conditional privilege applied to criminal theft complaint made to law-enforcement authorities).

In *Clark v. Jenkins,* the Amarillo Court of Appeals considered the appropriate privilege to apply to allegedly defamatory statements made by a civil rights group accusing the plaintiff of having a criminal history in a memorandum published to a congressman and the DOJ's Civil Rights Division. 248 S.W.3d 418, 423–25 (Tex. App.-Amarillo 2008, pet. denied). The court, after reviewing Texas privilege law, noted that, "[c]learly, all communications to public officials are not absolutely privileged." *Id.* at 432 (citing *Hurlbut,* 749 S.W.2d at 768). The court explained that "[i]nitial communications 'to a public offi-

cer ... who is authorized or privileged to take action' are subject to only a qualified privilege, not absolute immunity." *Id.* (quoting *Hurlbut*, 749 S.W.2d at 768). Moreover, the "filing of a criminal complaint is not absolutely privileged because, at that point, no judicial proceedings have been proposed and no investigating body has discovered sufficient information to present to a grand jury or file a misdemeanor complaint." *Id.* Citing both the Texas Supreme Court's opinion in *Hurlbut* and the Corpus Christi Court of Appeals's opinion in *Zarate*, the court concluded that "initial" communications "of alleged wrongful or illegal acts to an official authorized to protect the public from such acts [are] subject to a qualified privilege." *Id.* Because the defendant, who had published the memo to the DOJ, produced no evidence indicating that the DOJ "was actively contemplating, investigating, or litigating any civil rights violations" at the time of publication, and because the defendant's allegations made in the memorandum "were preliminary in nature, i.e., designed to launch an investigation that might lead to legal action," the court held that the defendant's statements made to the DOJ "were not part of an executive, judicial, or quasi-judicial proceeding, and were not subject to an absolute privilege." [14] *Id.* at 433.

In *Darrah v. Hinds*, the Fort Worth Court of Appeals considered the appropriate privilege to apply to statements made by a bank in a writ of sequestration filed with a court. 720 S.W.2d 689, 690–91 (Tex.App.-Fort Worth 1986, writ ref'd n.r.e.). The court noted that the absolute privilege applies to communications made in the course of, or "in contemplation" of,

judicial proceedings, while the qualified privilege applies to communications of wrongful acts to officials authorized to protect the public from such acts, such as criminal complaints. *Id.* at 691. Noting that the affidavit was filed and acted upon by the county court, the court held that the absolute privilege applied to the statements made in the writ of sequestration. *Id.* at 691–92.

In *Smith v. Cattier*, the Dallas Court of Appeals, within the context of a jurisdictional analysis, considered whether the absolute privilege applied to statements made to the Federal Bureau of Investigation ("FBI") by one business associate concerning another business associate. No. 05–99–01643–CV, 2000 WL 893243, at *3–4 (Tex.App.-Dallas July 6, 2000, no pet.) (not designated for publication). The court noted that, under Texas law, "[a]bsolute immunity does not extend to unsolicited communications to law enforcement officials or initial communications to a public officer ... authorized or privileged to take action" and, under such circumstances, "the actor is entitled to only a qualified privilege which may be lost if the defendant's actions are motivated by malice." *Id.* at *4 (citations omitted). The court concluded that because the defendant had failed to demonstrate that he was not involved in referring the plaintiff to the FBI or "instigating the investigation," and because the defendant failed to "negate" the plaintiff's claim that the defendant had "initiated, procured, and caused" the commencement of the criminal investigation into plaintiff's actions, the defendant had failed to establish that he was entitled to

---

14. Similarly, in *San Antonio Credit Union v. O'Connor*, the San Antonio Court of Appeals held that a qualified privilege applied to statements made in a criminal complaint supplied to a district attorney. 115 S.W.3d 82, 99 (Tex.App.-San Antonio 2003, pet. denied). The court noted that, at the time of the complaint, no judicial proceedings had been proposed. *Id.*

absolute immunity." [15] *Id.*

Finally, a federal district court in Texas recently considered the appropriate privilege to apply to allegedly defamatory statements made by a witness during Major League Baseball's ("MLB") investigation, which was conducted in conjunction with a federal investigation, into the illegal use of steroids. *See Clemens v. McNamee,* 608 F.Supp.2d 811, 823–25 (S.D.Tex. 2009). The court noted that, under Texas law, communications "to government agencies as part of legislative, judicial, or quasi-judicial proceedings are entitled to abso-

lute immunity so long as they are made as part of an ongoing proceeding, they are not unsolicited, and they are made to an agency whose findings need not be approved or ratified by another agency." [16] *Id.* at 823–24.

■ Having reviewed the Texas common law addressing the scope of the absolute privilege and its application in different factual scenarios,[17] we now turn to the arguments made by the parties in the instant case. Writt argues that only the qualified privilege applies to Shell's state-

15. More specifically, in *Smith v. Cattier,* the defendant was on the board of directors of a company that voted to terminate the plaintiff's position as the company's president and remove him and his wife from the board of directors. No. 05–99–01643–CV, 2000 WL 893243, at *3 (Tex.App.-Dallas July 6, 2000, no pet.) (not designated for publication). The board also voted to refer the plaintiff to the FBI. *Id.* Although the plaintiff was ultimately indicted, he was later acquitted and sued the defendant for slander and libel. *Id.* The defendant argued that the statements he had made to the FBI during an interview requested by the FBI in connection with its investigation were absolutely privileged. *Id.* at *4. The court rejected the defendant's absolute privilege argument, but its opinion suggests that the court did so not based upon the statements made during the course of the FBI interview, but instead upon the plaintiff's allegation that the defendant was one of the board members that had referred him to the FBI, which the court characterized as an "unsolicited communication" that instigated the criminal investigation. *Id.*

16. In reaching its holding, the court in *Clemens* relied significantly on *Shanks v. Allied-Signal, Inc.,* 169 F.3d 988 (5th Cir.1999). In *Shanks,* the court held that a National Transportation and Safety Board ("NTSB") accident investigation qualified as a quasi-judicial proceeding, and, thus, Texas law recognized absolute immunity for statements made during the NTSB investigation. *Id.* at 994–95. In reaching its holding, the court engaged in a "comprehensive" review of Texas case law on the scope of the absolute privilege in the context of communications made to govern-

ment agencies. *Id.* at 993–94. The court found "only two situations" in which Texas courts recognized that communications made to government agencies were not absolutely privileged: (1) cases involving "unsolicited communications to law enforcement officials" made "in advance of any formal proceeding or investigation" and (2) cases involving communications made to agencies that issue mere recommendations or preliminary findings. *Id.* at 994. The court held that the allegedly defamatory statements at issue in the case before it were "made in connection with an ongoing NTSB investigation" and were absolutely privileged. *Id.*

17. This Court has not previously addressed the proper privilege to apply in circumstances similar to those presented here. In *Watson v. Kaminski,* we noted that "attorney's statements made during litigation are not actionable as defamation, regardless of negligence or malice," and the absolute privilege "includes communications made *in contemplation of and preliminary to* judicial proceedings." 51 S.W.3d 825, 827 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (emphasis added). In *Marathon Oil Co. v. Salazar,* we addressed a jury charge issue pertaining to a qualified privilege for making a criminal complaint. 682 S.W.2d 624, 629–31 (Tex. App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.). However, we expressly stated that the defendant had not made any objection to the submission to the jury of the plaintiff's libel cause of action on the basis of absolute privilege, so we did not have the occasion to address the applicability of the proper privilege. *Id.* at 631.

ments made in the report to the DOJ because there is no summary-judgment evidence that the DOJ had initiated any legal proceedings against Shell at the time it submitted the report. Writt asserts that our disposition of this case is controlled by the Texas Supreme Court's opinion in *Hurlbut,* which indicates that statements made by Shell in its report to the DOJ were not absolutely privileged. Shell counters that the absolute privilege applies to "statements solicited in an ongoing government investigation." Focusing on the *Clemens* opinion, Shell asserts that "Texas law distinguishes between statements solicited by government officials or agents as part of an ongoing investigation," to which the absolute privilege applies," and "unsolicited statements unilaterally proffered to government officials for the purpose of instigating or launching such an investigation or proceeding," to which the qualified privilege applies. Shell notes that, in preparing the report, it was under the "continuing threat of prosecution for FCPA violations" as well as the "penalty of perjury" for any misstatements contained in the report. Shell emphasizes that it was ultimately prosecuted by the DOJ for conspiracy to violate the FCPA.

We hold that the summary-judgment evidence does not conclusively establish the applicability of the absolute privilege to the complained-of statements made by Shell in the report to the DOJ. *See Hurlbut,* 749 S.W.2d at 768 (stating that defendant was entitled to summary judgment on basis of absolute privilege only if evidence conclusively proves the privilege's application). Although Shell established that it made the report in its effort to cooperate with the DOJ, Shell actually prepared the report during the course of its own voluntary "internal investigation."

Shell did present evidence that it conducted its internal investigation in response to a DOJ inquiry after attending a meeting requested by the DOJ. However, there is no evidence conclusively establishing that a criminal case had been filed against Writt or Shell, or that a criminal prosecution was actually being proposed against either Writt or Shell, at either the time the DOJ contacted Shell or when Shell submitted its report to the DOJ. The summary-judgment evidence establishes that the DOJ initially contacted Shell on July 3, 2007, five months after a Shell contractor, Vetco Gray, had already pleaded guilty to violating the FCPA in connection with payments made through Panalpina. And Shell submitted the complained-of report to the DOJ on February 5, 2009. The DOJ did not, in Shell's words, "open a judicial proceeding and file a criminal complaint" against Shell until November 4, 2010, twenty months after Shell submitted its report. Just because the DOJ ultimately filed a judicial proceeding against Shell does not establish that it was proposing that one be filed when it contacted Shell on July 3, 2007 or received Shell's report on February 5, 2009.

Moreover, the report itself indicates that Shell also prepared it for important internal purposes. For example, Shell included in the report its findings and recommendations made to deter future "potential violations" of Shell's business principles, it recommended disciplinary action for "certain staff," and it stated that the "certain individuals" had been "identified" for "consequence management" by Shell. In its report, Shell was not proposing that either it or Writt should be prosecuted for a crime.[18]

---

18. Section 587 of the Restatement (Second) of Torts, entitled "Parties to Judicial Proceedings," provides:

A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to

Our conclusion that the absolute privilege does not apply to the statements made by Shell to the DOJ is based upon our review of Texas case law, which reveals that allegedly defamatory statements contained within criminal complaints, and other similar information provided by private parties to prosecutorial and law enforcement agencies prior to the initiation of criminal proceedings, are not subject to the absolute privilege. *See Clark*, 248 S.W.3d at 427–34; *Zarate*, 553 S.W.2d at 654. These holdings comport with the general recognition that the absolute privilege applies only to communications made in judicial proceedings and those communications made preliminary to or in serious contemplation of a judicial proceeding. *See Hurlbut*, 749 S.W.2d at 767 (citing RESTATEMENT (SECOND) OF TORTS § 588); *James*, 637 S.W.2d at 917; *Zarate*, 553 S.W.2d at 654; *see also San Antonio Credit Union*, 115 S.W.3d at 99 (stating that "an investigation into criminal activity does not amount to" proposed judicial proceeding and proposed judicial proceeding exists when investigating body finds "enough information either to present that information to a grand jury or to file a misdemeanor complaint").

In *Hurlbut*, a client of an insurance agency contacted an agent of the agency and the office of the Texas Attorney General after becoming concerned that the agency could not produce a copy of a master policy that the agency was selling. 749 S.W.2d at 764. The agent, after receiving this telephone call, then contacted the agency to inquire about the policy. *Id.* A representative of the agency reassured him and suggested he meet with the agency to "straighten out the matter." *Id.* When two insurance agents arrived at this purported meeting to straighten things out, they were "surprised by the appearance" of an assistant attorney general who had been "assigned to investigate" the insurance policy being sold by the agency. *Id.* At the meeting, an agency representative told the assistant attorney general that its employed agents did not have the authority to write the insurance policy that they were writing. *Id.* Thus, the agency effectively accused the agents of wrongdoing. The agents then accompanied the assistant attorney general to a local office and "cooperated in the investigation." *Id.* The Texas Supreme Court explained that the allegedly defamatory statements made by the agency representative at the meeting with the insurance agents were "best analogized" to the circumstances in which a conditional privilege applied. *Id.* at 768; *see also Gulf Atl. Life Ins. Co. v. Hurlbut*, 696 S.W.2d 83, 89–90 (Tex.App.-Dallas 1985), *rev'd*, 749 S.W.2d 762 (providing additional factual background and indicating that agency representative had originally, falsely informed a city attorney that the agents were not authorized to write the insurance policy and a city attorney had

publish defamatory matter concerning another *in communications preliminary to a proposed judicial proceeding*, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.
RESTATEMENT (SECOND) OF TORTS § 587 (1977) (emphasis added). Section 587 "applies to a litigant in a civil action, a defendant in a criminal prosecution, or one who, as private prosecutor, formally initiates a criminal action or applies for a search warrant by a written complaint under oath, made to the proper officer, charging another with crime." *Id.* § 587 cmt. b. It also "applies to communications made by a client to his attorney with respect to proposed litigation as well as to information given and informal complaints made to a prosecuting attorney or other proper officer preliminary to a proposed criminal prosecution whether or not the information is followed by a formal complaint or affidavit." *Id.*

then reported this information to the office of the Texas Attorney General).[19]

Again, here, although the record establishes that the DOJ contacted Shell to discuss Shell's engagement of Panalpina in Nigeria, there is nothing in the record that conclusively establishes that, at that time, the DOJ had filed a criminal proceeding against either Shell or Writt. Nor is there any summary-judgment evidence conclusively establishing that the DOJ, at the time that it contacted Shell, was acting in a manner preliminary to filing a criminal proceeding against either Shell or Writt. Similarly, Shell has not conclusively established that it actually contemplated in good faith and took under serious consideration the possibility of a judicial proceeding. And there is no evidence conclusively establishing that Writt, prior to Shell sharing its report with the DOJ, had been implicated in the alleged commission of a crime or reported to a law-enforcement agency for an alleged criminal act. Thus, the statements in Shell's report, at least as they pertained to Writt, were more in the nature of information provided by a private party to a prosecutorial agency implicating another in wrongful conduct. And, as noted above, Texas courts have indicated that a conditional privilege is more suitable to protect such statements.[20]

**19.** The parties have submitted to this Court, pursuant to our request at oral argument, their survey of cases from other jurisdictions addressing the application of the absolute and qualified privileges to certain statements. Although the parties vigorously disagree about a "majority" and "minority" rule concerning the application of the absolute privilege, they have provided us with a thorough and helpful examination of other jurisdictions' treatment of the privilege issue. The surveys reflect that other jurisdictions have formulated privilege rules based, in large part, upon public policy considerations. For example, in his post-submission brief, Writt cites a case from the Connecticut Supreme Court holding that, under Connecticut law, allegedly false and malicious statements made to a law enforcement officer investigating a criminal allegation are qualifiedly, rather than absolutely, privileged. *See Gallo v. Barile*, 284 Conn. 459, 935 A.2d 103, 114 (2007). The court in *Gallo* discussed policy considerations for adopting its rule, noting that a "qualified privilege is sufficiently protective of [those] wishing to report events concerning crime" and "[t]here is no benefit to society or the administration of justice in protecting those who make intentionally false and malicious defamatory statements to the police." *Id.* at 108–14.

In contrast, in its post-submission brief, Shell cites, among others, a case from the Massachusetts Supreme Court holding that, under its state's law, statements made to police or prosecutors prior to trial are absolutely privileged if they are made in the context of a proposed judicial proceeding. *Correllas v. Viveiros*, 410 Mass. 314, 572 N.E.2d 7, 11 (1991). The court in *Correllas* also discussed policy considerations supporting its rule, noting that a conditional or qualified privilege would "not adequately protect a witness or party because he or she may still have to go to court to prove the absence of malice or recklessness." *Id.* Although we have considered the surveys in which the jurisdictions discuss the various policy considerations supporting their respective rules, we base our holding upon what we consider to be the rule suggested by the weight of authority in Texas. We conclude that this authority indicates that, under Texas law, it is more appropriate to apply the conditional privilege to the complained-of statements made by Shell in the report that it submitted to the DOJ.

**20.** Our dissenting colleague argues that Shell should be protected by the absolute privilege because "it can face criminal liability for failure to adequately comply and cooperate with the DOJ's investigation," citing *United States v. Kay*, 513 F.3d 432, 454–55 (5th Cir.2007). In *Kay*, the defendant was charged with obstruction of justice for withholding certain documents and denying certain facts in testimony given to the United States Securities and Exchange Commission ("SEC") during the SEC's investigation of violations of the FCPA. *Id.* at 454. However, in *Kay*, the defendant was actually subpoenaed as a witness to appear before the SEC, and he was directed to produce documents and provide testimony. *Id.* Here, as explained above, Shell

Under the Restatement, Shell's communication is protected by the conditional privilege as a "Communication to One Who May Act in the Public Interest." *See* RESTATEMENT (SECOND) OF TORTS § 598. As such, given that a "sufficiently important public interest" may have "require[d]" that Shell make the communication to the DOJ, whether solicited by the DOJ or not, "to take action if the defamatory matter [were] true," Shell enjoys the adequate protection of the conditional privilege, not immunity.[21] *See id.* Section 598 is "applicable when any recognized interest of the public is in danger, *including the interest in the prevention of crime and the apprehension of criminals,* the interest in the honest discharge of their duties by public officers, and the interest in obtaining legislative relief from socially recognized evils." *Id.* § 598 cmt. d (emphasis added). And section 598 is specifically "applicable to defamatory communications to public officials concerning matters that affect the discharge of their duties." *Id.* § 598 cmt. e (*"Communications to Public Officials"*).

 And even if Shell could possibly be considered as a "witness" having made "communications preliminary to a proposed judicial proceeding," it would be entitled to the absolute privilege accorded a witness in a judicial proceeding only if its communications to the DOJ had "some relation to a proceeding that is actually contemplated in good faith and under serious consideration...." *Id.* § 588 cmt. e. As emphasized in the Restatement, the *"bare possibility* that the proceeding *might be* instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered." *Id.* (emphasis added).

In support of its argument that the complained-of statements in the report that it submitted to the DOJ are absolutely privileged, Shell relies greatly upon *Clemens,* 608 F.Supp.2d at 823–25. In *Clemens,* the court noted that the evidence before it demonstrated that the pertinent witness, Brian McNamee, had been interviewed by an Assistant United States Attorney as part of a federal investigation into the distribution of steroids. *Id.* at 824. McNamee and his counsel met with the prosecutor and agents from the FBI and the Internal Revenue Service numerous times, and McNamee had been told that his "witness status" could be reviewed if he "chose not to co-operate" and he was subject to prosecution for making false statements during these interviews. *Id.* The evidence also demonstrated that the prosecutor told McNamee that speaking to the MLB Commission "was part of his co-operation with the investigation in order to maintain his witness status." *Id.* Prior to the interviews with the MLB Commission, the prosecutor told McNamee that their proffer agreement would cover the interviews and he could face prosecution for any false material statements. *Id.* McNamee agreed to these terms and participated in three interviews with the MLB Commission, the interviews were all arranged by federal agents or Assistant United States Attorneys, and prosecutors and

was never subpoenaed as a witness by the DOJ, and it actually produced its report implicating Writt as part of its own "internal investigation."

**21.** Under the Restatement, had Shell actually filed a "[f]ormal or informal complaint[ ]" with the DOJ about Writt concerning an actual "violation[ ] of the criminal law" by him, it would then have been entitled to the absolute

privilege "under the rule stated in section 587" concerning "Parties to Judicial Proceedings." *See* RESTATEMENT (SECOND) OF TORTS § 598 cmt. e. But Shell's communication to the DOJ did not constitute a formal or informal criminal complaint against Writt, and Shell has made no attempt to characterize its communication as such.

FBI agents participated in all interviews between McNamee and the MLB Commission. *Id.* The federal district court determined that the evidence established that the investigation was an "ongoing proceeding," McNamee's statements "should be protected" "[a]s a matter of public policy," McNamee was "compelled" to make his statements to the MLB Commission "as part of a judicial proceeding," and McNamee's statements "should be treated with immunity." *Id.* at 823–25.

In the instant case, the facts established in the summary-judgment record do not demonstrate that the DOJ ever granted Shell any type of "witness status." Nor is there any evidence here of a formalized investigative process of the type engaged in by the MLB Commission with the assistance of federal prosecutors and the FBI. The *Clemens* opinion reveals that McNamee's statements to the MLB Commission were made in furtherance of its regulatory and oversight functions and preliminary to a proposed criminal proceeding that was actually contemplated. Indeed, McNamee had been granted "witness status." *Id.* at 824. Moreover, to the extent that the court's opinion in *Clemens* could possibly be read as applying the absolute privilege beyond how Texas courts have applied it, we note that the *Clemens* opinion is not controlling authority on this Court. Rather, we are bound to follow the guidance and reasoning provided by the Texas Supreme Court in *Hurlbut.*

### Conclusion

In sum, the summary-judgment evidence presented in the trial court below does not conclusively establish that, at the time Shell prepared its report following its "internal investigation" and submitted it to the DOJ, a criminal judicial proceeding against either Shell or Writt was either ongoing or "actually contemplated" or un-

der "serious consideration" by the DOJ or Shell. *See* RESTATEMENT (SECOND) OF TORTS § 588, cmt. e. Rather, the communication made by Shell in its report to the DOJ and complained of by Writt is protected by the conditional privilege as a "Communication to One Who May Act in the Public Interest." *See id.* § 598.

Accordingly, we hold that the trial court erred in granting Shell's summary-judgment motion. We sustain Writt's first issue. And we reverse the judgment of the trial court and remand for proceedings consistent with this opinion.

Justice BROWN, dissenting.

HARVEY BROWN, Justice, dissenting.

For more than one hundred years, Texas defamation law has artfully balanced two fundamental interests: a citizen's right to his good name and a citizen's right to free speech. Communications made in the context of judicial proceedings invoke two additional and equally important interests: a citizen's right to petition for redress and the administration of justice. When the judicial proceedings are criminal in nature, a citizen's interests in the deterrence and prosecution of crime are added to the balance. And when the government investigates a potential crime and calls on a citizen to respond with information, society's interest in encouraging cooperation with the investigation comes into play. In the defamation equilibrium, we safeguard these fundamental interests through privileges.

The Court's new opinion initially focuses on the public policy interests that it concludes require denying Shell an absolute privilege for its statements made in response to a Department of Justice inquiry on possible violations of the Foreign Corrupt Practices Act. According to the Court, recognition of an absolute privilege "would have the very dangerous effect of

actually discouraging parties from being truthful with law-enforcement agencies and instead encourage them to deflect blame to others without fear of consequence." I respectfully disagree.

For criminal prosecutions, our jurisprudence has reached a careful accord—we afford a qualified privilege to statements made by a private citizen who approaches a governmental authority with criminal allegations, but we afford an absolute privilege to communications made to prosecuting governmental authorities during or in contemplation of criminal proceedings. When a citizen, corporate or otherwise, is approached by a law-enforcement agency for cooperation in an ongoing investigation of a contemplated criminal prosecution, the administration of justice requires absolute privilege, which encourages the citizen's full and unreserved cooperation in the agency's information-gathering efforts, unhampered by fear of retaliatory lawsuits. Shell's cooperation with the DOJ falls into this category, and the trial court correctly afforded it absolute privilege. In reaching a contrary holding, the Court gives insufficient weight to both the benefits of an absolute privilege and the costs of a conditional privilege that depends on a speaker's subjective good faith. The Court's holding inevitably will create a fact issue in many cases. And a conditional privilege frustrates the kind of frankness, cooperation, and self-reporting that is vital to the DOJ's prevention and prosecution of corporate misconduct in international business dealings under the FCPA. I believe the balance of the benefits and costs of an absolute privilege for statements made by a potential target of a DOJ investigation, as well as the detriments of requiring jury trials in many of these cases, warrants an absolute privilege. I therefore respectfully dissent.

## *Hurlbut* is not controlling

Before turning to the policy issues, I first will address the only Texas Supreme Court opinion that considers the scope of a privilege for a claimed defamatory statement that is not part of a judicial proceeding: *Hurlbut v. Gulf Atlantic Life Insurance Co.*, 749 S.W.2d 762 (Tex.1987). I disagree with the Court that Shell is only entitled to a qualified privilege under *Hurlbut.*

In that case, Gulf Atlantic Insurance Company proposed that Hurlbut "form a partnership to serve as the administrator of a proposed health insurance trust which would sell and service group health insurance policies underwritten by Gulf Atlantic" and then later instructed Hurlbut to start selling policies under the trust agreement. *Id.* at 764. A potential client who became concerned when Hurlbut could not produce a copy of the master policy from Gulf Atlantic contacted the Attorney General's office to complain. *Id.* at 764. Gulf Atlantic suggested a meeting with Hurlbut to resolve the matter. *Id.* When Hurlbut arrived for the meeting, he was surprised to be met by an assistant attorney general "assigned to investigate the group health insurance program" sold by Hurlbut. *Id.* During the meeting, Gulf Atlantic's president made a defamatory statement about Hurlbut. *Id.* The Texas Supreme Court refused to apply an absolute privilege. *Id.* at 768. The Court explained that the absolute privilege attaches only to a "select number of situations which involve the administration of the functions of the branches of government." *Id.* And the Court held that "the occasion of Gulf Atlantic's communication to the assistant attorney general in this case is best analogized to the conditional privilege described in section 598 of the Restatement." *Id.*

*Hurlbut* is distinguishable because it is an instigation case—Gulf Atlantic was *not*

self-reporting in response to a criminal probe. Hurlbut was a salesperson, not a Gulf Atlantic employee, who sold insurance policies under a trust agreement with Gulf Atlantic. Hurlbut had formed a separate partnership (at Gulf Atlantic's behest) before the incident arose. Thus, Gulf Atlantic reported to evade potential criminal liability by implicating another company (Hurlbut and his partnership), not to confess guilt. Thus, unlike this case, *Hurlbut* involved the instigation of prosecution against someone else, not a confession of culpability. In conclusion *Hurlbut* does not answer whether cooperation with an FCPA investigation by the DOJ implicates one of the "select number of situations which involve the administration of the functions of the branches of government" and therefore requires the recognition of an absolute privilege. *Id.* at 768. It does, however, suggest that our focus should be on public policy considerations, i.e., the administration of government.

### Public policy favors granting an absolute privilege

The rule granting absolute privilege is "one of public policy" so both the Court and I begin our analysis here. *Reagan v. Guardian Life Ins. Co.*, 140 Tex. 105, 166 S.W.2d 909, 913 (1942).

### A. The policy reasons that statements made in contemplation of judicial proceedings are absolutely privileged

Statements made "during the course of judicial proceedings" are absolutely privileged. *Bird v. W.C.W.*, 868 S.W.2d 767, 771 (Tex.1994). This privilege protects parties not only from liability "but also from the danger of even an unsuccessful civil action." RESTATEMENT (SECOND) OF TORTS ch. 25, topic 2, tit. B, intro. note (1977).

Absolute privileges are recognized to protect public policy interests deemed sufficiently important to trump the rights of individuals who would otherwise have a claim against a person. *See Reagan*, 166 S.W.2d at 913 (absolute privilege is founded on public policy "that the good it accomplishes in protecting the rights of the general public outweighs any wrong or injury which may result to a particular individual"); *Zarate v. Cortinas*, 553 S.W.2d 652, 654 (Tex.Civ.App.-Corpus Christi 1977, no writ) (absolute privilege applies to conduct that otherwise would be actionable "because the defendant is acting in furtherance of some interest of social importance which is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation"). An absolute privilege for statements made in judicial proceedings is "based on the policy of protecting the judicial process," *Briscoe v. La-Hue*, 460 U.S. 325, 334, 103 S.Ct. 1108, 1115, 75 L.Ed.2d 96 (1983) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 439, 96 S.Ct. 984, 999, 47 L.Ed.2d 128 (1976) (White, J., concurring)), particularly from "intimidation and self-censorship," *id.* at 341–42, 103 S.Ct. at 1119. *See also* RESTATEMENT (SECOND) OF TORTS ch. 25, topic 2, tit. B, intro. note (1977) (absolute privileges exist to protect persons in limited circumstances when law wants individuals to "be as free as possible from fear that their actions in that position might have an adverse effect upon their own personal interests."). "The administration of justice requires full disclosure from witnesses, unhampered by fear of retaliatory suits for defamation." *James v. Brown*, 637 S.W.2d 914, 917 (Tex. 1982). And because the administration of justice is a process that encompasses more than simply judicial proceedings, the absolute privilege reaches statements made preliminary to a proposed judicial proceeding, as well as informal complaints made to a prosecuting attorney or other proper

officer preliminary to a proposed criminal prosecution. RESTATEMENT (SECOND) OF TORTS § 587. An individual speaker who makes a defamatory statement "may not deserve the privilege, nevertheless, the law grants the privilege to protect the integrity of the process." *Attaya v. Shoukfeh,* 962 S.W.2d 237, 239 (Tex.App.-Amarillo 1998, pet. denied); *accord Hernandez v. Hayes,* 931 S.W.2d 648, 654 (Tex.App.-San Antonio 1996, writ denied) ("The absolute privilege is as much a protector of the *process* as it is a protector of those who avail themselves of the process.").

## B. Absolute privilege encourages cooperation, which aids enforcement efforts

Absent an absolute privilege, the threat of liability may deter a company from fully cooperating in an FCPA investigation. When a corporation accepts some fault for its conduct, it is necessarily attributing the fault to individuals who are its agents, officers, or employees. Thus, a corporation's frank acceptance of its fault, by its very nature, will often result in some individuals within the company disagreeing with that assessment. If the identified individuals and entities may sue for defamation, a company will have a disincentive to cooperate and accept responsibility. If absolute privilege is not available, a cooperating party runs the risk of defamation actions by anyone identified as having involvement in a potentially prohibited transaction. This risk creates a disincentive for companies to conduct their own investigations, to make frank assessments of fault, and to communicate findings to the DOJ.

Without corporate cooperation, more of the burden of the investigation shifts to the government, requiring the DOJ to piece together knowledge and understanding that the company already has from its involvement in the transaction. The DOJ may have to use formal judicial processes to obtain documents and testimony and then invest additional effort to review the information and ascertain its relevancy, when the corporation easily could identify and assimilate the key documents and important transaction details. And some information is difficult to obtain without an inside perspective—corporations fearful of defamation liability may be reluctant even to identify those responsible for certain decisions, and the decision-maker on paper is not always the decision-maker in practice. Thus, creating disincentives to full disclosure imposes significantly greater costs on the DOJ and hampers its efforts to investigate FCPA violations.

The detection of foreign corrupt practices, cooperation of persons engaged in such conduct, and deterrence of future violations are all enhanced by creating full incentives for disclosure of information to the DOJ. The extraterritorial aspects of FCPA violations make them costly and time-consuming to investigate. Delayed responses, language barriers, and lack of jurisdiction may hinder the FCPA's enforcement. Cooperation from individuals and companies willing to undertake internal investigations or to assist the DOJ in its efforts can help overcome these obstacles. Recognition of an absolute privilege, therefore, promotes the policy goals underlying the FCPA by aiding law enforcement through increased access to information and efficiency.

To deny absolute privilege here would be to chill the free flow of information and impair the DOJ's ability to conduct its investigations and enforce the FCPA. *See 5–State Helicopters,* 146 S.W.3d 254, 259 (Tex.App.-Fort Worth 2004, pet. denied) (stating that adopting "a rule that private citizens' communications to a quasi-judicial body about a matter that the entity was

authorized to investigate and resolve would not be privileged unless and until the proceeding reached the administrative hearing stage ... would have a chilling effect on the free flow of information and deter rather than aid the decision-making body's efforts to obtain necessary information."); *Attaya*, 962 S.W.2d at 239 (stating that absolute privilege "is intended to protect the integrity of the process itself and to insure that the decision-making body gets the information it needs."). Without incentives to cooperate, enforcement of the FCPA would be curtailed. Robert W. Tarun, *The Foreign Corrupt Practices Act Handbook: A Practical Guide for Multinational General Counsel, Transactional Lawyers and White Collar Criminal Practitioners*, 190 (2nd ed. 2012) (stating that "DOJ and SEC do need companies to voluntarily disclose because their resources are limited."); *see also Examining Enforcement of the Foreign Corrupt Practices Act: Hearing Before the Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary*, 111th Cong. 8 (Nov. 30, 2010) (statement of Greg Andres, Acting Deputy Assistant Att'y Gen., Crim. Div., Dep't of Justice) (stating that, in many cases, DOJ relies on "the self-disclosure and cooperation of corporations" and that self-disclosure is an important factor in cases that get resolved).

The process is thus designed to promote cooperation through incentives such as better settlement prospects and more lenience in the Federal Sentencing Guidelines, as discussed below. "[The companies] make a decision to disclose and in return for their disclosing and their investigating, in large part, their own criminal conduct, they get meaningful credit with the department and that credit goes into the decision whether to file an information or charge the company, whether to enter a deferred prosecution or non-prosecution agreement." *See* Philip Segal, *Coming Clean on Dirty Dealing: Time for A Fact–Based Evaluation of the Foreign Corrupt Practices Act*, 18 FLA. J. INT'L L. 169, 177 n. 28 (2006). These incentives are less effective when offset or overshadowed by the potential for defamation litigation and liability.

## C. Absolute privilege recognizes the precarious position of corporations involved in questioned transactions

Absolute privilege also recognizes that companies feel compelled to provide information, often against their own interest and those of their employees, to avoid larger penalties. A company like Shell is, in the face of a DOJ inquiry, in a quandary: it can provide inculpatory statements regarding actions taken on its behalf by its employees, recognizing that it is exposed to a defamation claim. Or it can face criminal prosecution or penalization for a failure to comply and cooperate adequately with the DOJ's investigation. *See, e.g., U.S. v. Kay*, 513 F.3d 432, 454–55 (5th Cir.2007) (affirming FCPA and obstruction of justice convictions against corporate president who failed to disclose documents subpoenaed during SEC investigation and failed to disclose misconduct in testimony given during investigation).[1] The qualified immunity adopted by the Court protects Shell for all but those statements made with actual malice. But the reason that absolute privilege extends even to malicious untruths is not because such statements are rendered less deserving of protection in the context of a judicial or quasi-judicial proceeding; it is because balancing

---

1. *Kay*, a criminal case, does not discuss whether an absolute privilege applies to statements made during the SEC investigation.

of the rights at issue in such proceedings demands immunity—i.e., protection against "the danger of even an unsuccessful civil action"—rather than the opportunity to litigate state of mind. *See* RESTATEMENT (SECOND) OF TORTS ch. 25, topic 2, tit. B, intro. note (1977). Encouraging witnesses to share requested information about possible criminal violations with a trained government investigator whose job is to separate fact from fiction should be encouraged—even at the cost of some defamatory statements going without remedy—when a witness does not initiate the investigation and faces prosecution for any false statements. *See Clemens v. McNamee*, 608 F.Supp.2d 811, 816–17 (S.D.Tex. 2009), *aff'd*, 615 F.3d 374 (5th Cir.2010). Similarly, Shell's cooperation with the DOJ was essential to lowering its potential liability in fines—either through agreed disposition with the DOJ or in post-trial sentencing—and withholding information could have subjected Shell to federal prosecution. *See* 18 U.S.C. § 1505 (criminalizing, in relevant part, anyone who, "with the intent to avoid, evade, prevent, or obstruct compliance ... with any civil investigative demand ..., willfully withholds ... any documentary material, answers to written interrogatories, or oral testament, which is the subject of such demand"); *Kay*, 513 F.3d at 455 (affirming obstruction of justice conviction for withholding documents and making false statements during FCPA investigation). In the context of an ongoing government investigation, there are enormous risks to maliciously implicating an innocent person in an FCPA violation. The potential consequences to a company like Shell are themselves adequate to protect the interests of Writt and similarly situated employees from malicious defamation.

### D. Sound public policy distinguishes between solicited and unsolicited communications [2]

When a criminal investigation is ongoing, the governmental authority—a neutral and objective investigator—has determined that there is some threshold level of evidence or other grounds for suspicion

---

**2.** The Restatement goes further, recognizing an absolute privilege for informal complaints made to a prosecuting attorney or similar governmental authority. RESTATEMENT (SECOND) OF TORTS, § 587, cmt. b (providing that absolute privilege applies to "information given and informal complaints made to a prosecuting attorney or other proper officer preliminary to a proposed criminal prosecution whether or not the information is followed by a formal complaint or affidavit"); *id.* § 598 cmt. e ("Formal or informal complaints to a prosecuting attorney or other law enforcement officer concerning violations of the criminal law are absolutely privileged under the rule stated in § 587"). A number of states have adopted this approach. *See e.g., Correllas v. Viveiros*, 410 Mass. 314, 572 N.E.2d 7, 11 (1991) (statements made to police or prosecutors before trial are absolutely privileged if they are made in context of proposed judicial proceeding); *McGranahan v. Dahar*, 119 N.H. 758, 408 A.2d 121, 124 (1979) (applying absolutely privilege to complaints and statements to prosecuting authority during pre-arrest investigation because they constitute part of initial steps in judicial proceeding); *Bergman v. Hupy*, 64 Wis.2d 747, 221 N.W.2d 898, 901–02 (1974) (applying absolute privilege to statements to assistant district attorney while seeking issuance of criminal complaint); *Block v. Sacramento Clinical Labs, Inc.*, 131 Cal.App.3d 386, 182 Cal.Rptr. 438, 442–43 (1982) (holding that report prepared "upon the request of the office of the district attorney in furtherance of its investigation whether there was probable cause to initiate criminal charges" was absolutely privileged because there are strong policy reasons to "assure free and open channels of communication between citizens and public agencies and authorities charged with the responsibility of investigating wrongdoing"). It is unnecessary to decide whether to apply the Restatement prosecutorial privilege here, but many of the reasons for that privilege do apply here, as discussed herein.

to justify an investigation on the subject matter. In such a circumstance, the allegedly defamatory statements are not the initial cause of the governmental authority's decision to investigate. This lessens, though it does not eliminate, the risk that the speaker's defamatory statements, alone, could spur government action against the defamed party. And when the speaker is approached as a potential target of the investigation, as Shell was here, it may also lessen the efficacy of a speaker's defamatory statements—a governmental authority may treat finger-pointing by suspected lawbreakers with heightened skepticism. Thus, the governmental authority's role as adjudicator of truth and fiction is implicated.

In light of these policies, numerous Texas cases have distinguished between statements that are made pursuant to an ongoing or already contemplated proceeding (which fall within the privilege) and statements that caused or were intended to cause the initiation of a proceeding (which do not fall within the privilege). Although both statements are "preliminary to" a judicial proceeding in a temporal sense, protection is only provided to the first because it does not cause the criminal investigation or proceeding. *Compare San Antonio Credit Union v. O'Connor*, 115 S.W.3d 82, 99 (Tex.App.-San Antonio 2003, pet. denied) (holding that criminal complaint was not absolutely privileged because "no judicial proceedings had been proposed" when complaint was filed); *Clark v. Jenkins*, 248 S.W.3d 418, 433 (Tex.App.-Amarillo 2008, pet. denied) (holding that absolute privilege was not available when statements were "preliminary in nature—*i.e.*, designed to launch an investigation that might lead to legal action"); *Smith v. Cattier*, No. 05–99–01643–CV, 2000 WL 893243, at *4 (Tex.App.-Dallas July 6, 2000, no pet.) (not designated for publication) (noting that witness's

failure to negate that his communication with law enforcement authorities had "initiated, procured, and caused" criminal investigation into plaintiff's actions); *Zarate*, 553 S.W.2d at 655–56 (holding that complaints filed with sheriff's office to initiate criminal investigation into financial improprieties were not entitled to absolute privilege); *Vista Chevrolet, Inc. v. Barron*, 698 S.W.2d 435, 438 (Tex.App.-Corpus Christi 1985, no writ) (declining to apply absolute privilege to criminal theft complaint made to law enforcement authorities), *with Perdue, Brackett, Flores, Utt & Burns v. Linebarger, Goggan, Blair, Sampson & Meeks, L.L.P.*, 291 S.W.3d 448, 453 (Tex. App.-Fort Worth 2009, no pet.) (applying absolute privilege to law firm's statements about competing law firm in memo to city council before council meeting regarding extension of competing firm's contract with city); *5–State Helicopters*, 146 S.W.3d at 259 (applying absolute privilege to helicopter company's letters to FAA complaining of inspector's actions in course of FAA inspection and investigation); *Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 994 (5th Cir.1999) (applying absolute privilege statements made as part of "ongoing" National Transportation and Safety Board accident investigation); *Clemens*, 608 F.Supp.2d at 823–24 (applying absolute privilege to solicited, involuntary statements made to federal prosecutors and investigators and to commission formed by Major League Baseball "as part of an ongoing proceeding").

These distinctions—between who initiated the contact between the speaker and the governmental authority and whether the governmental authority already had cause to investigate—are also important because, among other reasons, a private citizen generally has no legal obligation to investigate, ascertain the truth of, and report on the criminal activities of others.

*Cf.* TEX. PEN.CODE ANN. § 38.17–.171 (requiring person to report only two specific categories of offenses under certain circumstances). But when a governmental authority has independently commenced investigatory proceedings and reached out to a private citizen for information, the citizen may be subject to penalization for interfering or failing to cooperate. *See, e.g.,* TEX. PEN.CODE ANN. § 37.09(a)(1), (c) (West Supp.2011) (prohibiting person who is aware of investigation or official proceeding from concealing "any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding" and "making such conduct punishable" as third degree felony or higher); 18 U.S.C. § 1505 (prohibiting obstruction of proceedings before federal departments, agencies and committees, with penalties including fine and imprisonment). And, with respect to FCPA investigations and prosecutions, the DOJ has informed corporate citizens like Shell that a "corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents" is one of the factors the DOJ considers when "conducting an investigation, determining whether to bring charges, and negotiating plea agreements." *See* Deputy Attorney General's *Federal Prosecution of Corporations* (June 16, 1999), *available at* www.justice. gov/criminal/fraud/documents/reports/1999/ charging-corps.PDF, last accessed on June 20, 2013. Moreover, if the matter is not resolved with the DOJ and proceeds to trial, the Federal Sentencing Guidelines dictate that the timing and nature of a corporation's cooperation and self-reporting to the DOJ or other appropriate governmental authority be taken into account in setting fines. *See* U.S.S.G. § 8C2.5.

It is therefore not surprising that several federal courts have concluded that statements made as part of an ongoing criminal investigation are entitled to an absolute privilege under Texas law. *See Clemens,* 608 F.Supp.2d at 824 ("[Assistant U.S. Attorney] Parrella's investigation, much like the NTSB's investigation at issue in *Shanks,* was an ongoing proceeding."); *Shanks,* 169 F.3d at 993–94 (holding that, under Texas law, "NTSB accident investigations are quasi-judicial proceedings, from which it would follow that any communications made during such investigations are absolutely immune from suit"). In the same vein, the Texas Supreme Court applied an absolute privilege in a defamation case based on a letter written to a grand jury foreperson charging a violation of the criminal law in *Hott v. Yarborough,* 112 Tex. 179, 245 S.W. 676, 678–79 (1922).

### E. Conclusion on policy analysis

Whether to recognize an absolute privilege or qualified privilege is based upon public policy considerations that "treat[ ] the ends to be gained by permitting defamatory statements as outweighing the harm that may be done to the reputation of others." RESTATEMENT (SECOND) OF TORTS ch. 25, title B, introductory note (1977); *cf. Harlow v. Fitzgerald,* 457 U.S. 800, 813, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982) (stating that "[t]he resolution of immunity questions inherently requires a balance between the evils inevitable in any available alternative"). The balancing of these interests is difficult and reasonable minds can disagree about the weight to be given to each interest and the impact of recognizing—or refusing to recognize—privileges for defamatory statements.

On the one hand, there are societal and individual costs associated with giving Shell an absolute privilege—Writt will lose his right to file a lawsuit accusing Shell of defamation. Shell has an incentive to blame lower level employees, who are less

capable of defending themselves. So its statement has characteristics of both instigation and self-reporting in response to a formal request for disclosure by a prosecuting authority. As a potential target, Shell's investigation of its own employees may not be entirely independent or objective.

On the other hand, balanced against the individual's interest in protecting his reputation are a number of important societal factors implicated by an FCPA investigation. Statements made in response to a request by the DOJ as part of an FCPA investigation are analogous to statements solicited by prosecutors as part of their investigation. Courts have made a policy decision that complaints to prosecutors are entitled to an absolute privilege even when they are false and malicious. Such protection encourages reporting. Moreover, the prosecutors themselves, as part of their investigation, examine the speaker's motivations. And if the prosecutor determines that statement is false and malicious, the harm created by the statement is limited to a particular audience and is minimized.

A statement that contains a malicious misstatement may materially advance the prosecutor's investigation by revealing an effort to deflect blame and thus implicating the speaker's own culpability and leading to the discovery of other important facts. And investigations of events occurring overseas involving multiple parties may well result in disagreements on the facts, and thus increase the potential for error. Opening the door to defamation lawsuits that permit the factfinder to second-guess the speaker's motivation may well lead to intolerable self-censorship and might dissuade a timorous corporation from freely stating its view of the facts. Self-censorship may be further exacerbated by the potential for damages, presumed or punitive, that exists in FCPA investigations.

Certainly the individual's right to the protection of his own good name is important, but when a statement is only published to one audience—an audience that is under a duty to investigate it and determine its accuracy, as the DOJ is charged—and is done so at that agency's request, it is necessary to protect some false statements made with malice in order to protect other speech that public policy strongly seeks to encourage. Self-reporting in response to a criminal probe should be fostered as good policy, and there is some confidence in the truthfulness of the statements made in connection with these sorts of reports, because false statements could subject the speaker to further criminal liability.

I believe that merely granting a qualified privilege does not properly balance these interests here. A qualified privilege requires a determination that the speaker acted in good faith, a subjective inquiry that will often require a jury. The combination of the broad powers granted both in law and in practice to the DOJ in investigating and resolving FCPA matters and the DOJ's solicitation of Shell's cooperation in its ongoing investigation lead me to conclude that public policy is best implemented by securing "the utmost freedom" for Shell to respond and provide information to the DOJ. *Cf.* RESTATEMENT (SECOND) OF TORTS § 585 cmt. c (primary purpose of granting absolute privilege for statements by judges is to give them "the utmost freedom" in performing their tasks); *id.* § 587 cmt. a (absolute privilege granted to parties to judicial proceedings is "based upon the public interest in according to all men the utmost freedom of access to the courts"). Shell's role in providing evidence in connection the investigation is of "fundamental importance in the administration of justice. The final judgment of [the DOJ on whether to prosecute a possible FCPA violation] must be based on the facts as shown by [its state-

ments], and it is necessary therefore that a full disclosure not be hampered by fear of private suits for defamation." RESTATEMENT (SECOND) OF TORTS § 588 cmt. a. As part of its determination, the DOJ—much like a jury—attempts to separate fact from fiction. *Briscoe,* 460 U.S. at 335, 103 S.Ct. at 1115 (quoting *Imbler,* 424 U.S. at 439, 96 S.Ct. at 999 (White, J., concurring)) (noting that courts' ability "to separate truth from falsity, and the importance of accurately resolving factual disputes in" judicial proceedings warrant absolute privilege in order to give witnesses "every encouragement to make a full disclosure of all pertinent information within their knowledge."). The DOJ's prosecutorial role requires it to remain neutral and objective in analyzing the evidence presented to it, again much like a jury or factfinder. *See Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Finally, the DOJ even offers inducements to companies like Shell to cooperate in the form of credits used in its settlement formula. Here, the DOJ began its own investigation and solicited Shell's cooperation, and I believe these policies warrant encouraging such cooperation through an absolute privilege.

### Shell's statements were made in contemplation of judicial proceedings

The Court correctly identifies the principal legal issue here: whether Shell's statements to the DOJ were made preliminary to or in serious contemplation of a judicial proceeding and are thus absolutely privileged. The Court holds that Shell's statements do not fit within the judicial proceedings privileges, concluding instead that the statements are more in the nature of an unsolicited criminal complaint and thus not entitled to absolute privilege. Although it is undisputed that Shell's statements here were not made *during* a judi-

cial proceeding, I agree with Shell that its communications to the DOJ were made *in contemplation of* a judicial proceeding— the criminal prosecution that the DOJ did in fact initiate.

The judicial privilege applies to statements made in judicial proceedings when the statement satisfies three elements: (1) the contemplation of or existence of a proceeding (2) that is judicial or quasi-judicial in nature and (3) related to the statements. *See Perdue, Brackett, Flores, Utt & Burns,* 291 S.W.3d at 452. With respect to the first element, the privilege extends not only to statements in the formal proceeding itself but also to statements made before a proceeding is formally commenced if a proceeding is contemplated, proposed, or in its preliminary stages. *See Perdue, Brackett, Flores, Utt & Burns,* 291 S.W.3d at 452; *5–State Helicopters,* 146 S.W.3d at 257 (stating that absolute privilege applies to "communications made in contemplation of or preliminary to a quasi-judicial proceeding"); *Watson v. Kaminski,* 51 S.W.3d 825, 827 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (stating that "absolute privilege includes communications made in contemplation of and preliminary to judicial proceedings"); *see also* RESTATEMENT (SECOND) OF TORTS § 588 cmt. e (stating that, in regard to communications preliminary to "proposed judicial proceeding," absolute privilege applies "when the communication has some relation to a proceeding that is actually contemplated in good faith and under serious consideration by the witness or a possible party to the proceeding," and that "bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered"). The "preliminary to" a judicial proceeding test is applied to lawyers, witnesses, and potential parties in contemplated judicial (and quasi-judicial) proceed-

ings. RESTATEMENT (SECOND) OF TORTS §§ 586 & cmt. a, 588 cmt. e.

Relying on the "preliminary to" language in section 587 of the Restatement, Shell points out that the DOJ ultimately filed a criminal proceeding against Writt and therefore contends that its statements were preliminary to a judicial proceeding. Relying on the "contemplated proceedings" language found in comment e to section 588 and a number of Texas cases, Writt responds that Shell must prove that either the prosecuting authority had a subjective intent to file charges at the time the statements were made—i.e., that the DOJ "actually planned" to file criminal charges at the time of Shell's statements— or that, objectively, the prosecuting authority "had sufficient information to initiate criminal proceedings" before the statement was made. Writt contends that a criminal proceeding initiated seventeen months after Shell's communication does not satisfy this burden.

The Restatement's alternative formulations of the test that expand absolute privilege from judicial proceedings to matters preliminary to judicial proceedings include two components: (1) a temporal component that focuses on the timing of the statements (the "preliminary to" statement of the rule) and (2) a subjective component that focuses on whether a speaker or a possible party to the proceeding contemplated a proceeding at the time the statements were made (the "in contemplation of" statement of the rule).[3] *See, e.g., Bell v. Lee*, 49 S.W.3d 8, 11 (Tex.App.-San Antonio 2001, no pet.) (applying judicial privilege when writer was contemplating future litigation at time of allegedly defamatory

letter); *Watson*, 51 S.W.3d at 827 (applying absolute privilege to attorney's letter offering not to bring similarly situated parties' claims against company in exchange for payment because letter contemplated suit if payment was not made); RESTATEMENT (SECOND) OF TORTS § 588 cmt. e (stating that preliminary to "proposed judicial proceeding" prong of inquiry is satisfied "when the communication has some relation to a proceeding that is actually contemplated in good faith and under serious consideration by the witness or a possible party to the proceeding"). Thus, the fact of a subsequent proceeding does not, alone, establish when the speaker or possible party first contemplated the proceeding; the speaker may have contemplated the proceeding only after the allegedly defamatory statements. *See, e.g., Hurlbut*, 749 S.W.2d at 764 (declining to apply absolute privilege even though parties allegedly defamed were ultimately arrested and imprisoned). Conversely, the absence of a formal proceeding does not establish that a speaker did not seriously contemplate such a proceeding at some point. *See, e.g., Bell*, 49 S.W.3d at 11 (applying privilege even though litigation contemplated at time of letter was not ultimately initiated).

Relying on *San Antonio Credit Union v. O'Connor*, Writt contends that Shell's evidence proved only an active DOJ "investigation," not an actual or planned "proceeding," which is not sufficient to invoke the privilege. *See* 115 S.W.3d at 99 (stating that "an investigation into criminal activity does not amount to a 'proposed judicial proceeding.'"). The court in *San Antonio Credit Union* stated, in the context of a statement made to a prosecuting authority, that "[a] judicial proceeding would only be

---

3. The contemplation component of absolute privilege is normally invoked by a speaker who is the party (or the party's attorney) initiating the proceedings, such as a district attorney or a plaintiff in civil litigation. But

there is no good reason that the rule should not also apply to speakers who are potential defendants in a proceeding and speak to the party conducting the investigation.

'proposed' when the investigating body found enough information either to present that information to a grand jury or to file a misdemeanor complaint." *Id.*

I would not follow *San Antonio Credit Union*—which is not binding on this Court—for three reasons. First, the court's definition of when a proceeding is "proposed" is not founded in the case law, could only apply to proposed "judicial" proceedings, not "quasi-judicial" proceedings, and would necessarily exclude prosecutions under the FCPA, which are pursued without a grand jury or misdemeanor complaint. *See id.* Second, *San Antonio Credit Union* ignores the distinction made by other Texas cases between absolutely privileged statements that are made pursuant to an ongoing or already contemplated proceeding and qualifiedly privileged statements that caused, or were intended to cause, the initiation or contemplation of a proceeding.

Third, the absolute privilege defense is designed to encourage a speaker to freely communicate. In the civil litigation context, a potential plaintiff who speaks before the litigation commences knows his or her intent—whether he or she intends to file a lawsuit—but in the criminal context the speaker who is a potential defendant cannot know the intent of the prosecuting authority. Nor is the speaker privy to all the information gathered by the prosecuting authority such that the speaker could attempt to assess whether probable cause to commence a criminal prosecution exist-

ed at the time. In order to provide assurances to a speaker—the reason for recognizing immunity in the first place—the contemplation test in the criminal context should not focus on the subjective intent of, or objective proof available to, the prosecuting attorney; rather, it should focus on the speaker's subjective mental state. And when the criminal investigation is not initiated by the speaker and the speaker is responding to an inquiry by a prosecutor about the potential criminal misconduct, I would hold that the speaker as a matter of law contemplates judicial proceedings.

For all of these reasons, I would hold that Shell's communications to the DOJ were made in relation to judicial proceedings that were contemplated at the time of the communications and thus are absolutely privileged.

### Shell's communications to the DOJ were made as part of a quasi-judicial proceeding

An absolute protection also protects statements made as part of, or preliminary to, a quasi-judicial proceeding. I would alternatively hold that Shell's statements were made as part of a quasi-judicial proceeding.[4]

A governmental entity has quasi-judicial power if it has the power and authority to investigate and "draw conclusions from such investigations." *Parker v. Holbrook*, 647 S.W.2d 692, 695 (Tex.App.-Houston [1st Dist.] 1982, writ denied); *see also Perdue, Brackett, Flores, Utt &*

4. Although Shell contends that its statements were in contemplation of judicial proceedings and focuses on whether "the important public policy considerations underlying the absolute privilege for judicial proceedings" apply here, it also argues that the evidence demonstrates that the DOJ investigation "would ... satisf[y]" the elements of a quasi-judicial proceeding. We may consider whether the DOJ's investigation constitutes a quasi-judi-

cial proceeding because Writt raised the issue in its original appellant's brief, Shell addressed it as an alternative argument in its brief, and the test used by courts in determining whether a proceeding is quasi-judicial aids in identifying policy considerations that should be considered in the delicate balancing that influences whether an absolute privilege should apply here.

*Burns,* 291 S.W.3d at 453 (quasi-judicial power includes the power to investigate and decide issues); *Clark,* 248 S.W.3d at 431 (same). The policies for extending absolute privilege to quasi-judicial proceedings are virtually identical to those for judicial proceedings: (1) citizens should have the unqualified right to communicate with decision-making governmental agencies without the fear of civil litigation and (2) the administration of justice will be better served by full disclosure from witnesses who are not deterred by the threat of retaliatory lawsuits for defamation. *See 5–State Helicopters,* 146 S.W.3d at 257; *Darrah v. Hinds,* 720 S.W.2d 689, 691 (Tex.App.-Fort Worth 1986, writ ref. n.r.e.). And, like the courts, executive and administrative agencies with decision-making discretion often have procedures and processes designed to enable them to obtain and sift through information to decipher fact from fiction. Thus, public policy often favors allowing such entities unfettered access to information over restrictions that encourage truthfulness but also limit the information available for the decision-making process. "The absolute privilege is intended to protect the integrity of the process and ensure that the quasi-judicial decision-making body gets the information it needs." *5–State Helicopters,* 146 S.W.3d at 257.

The DOJ's FCPA investigation satisfies most of the elements of quasi-judicial power.[5] The DOJ is statutorily imbued with the duty to prosecute offenses against the United States. *See* 28 U.S.C. § 547 (2006). With respect to the FCPA, the DOJ is given wide latitude in establishing and carrying out the procedures by which violations are investigated and prosecuted and in determining what and when to investigate or prosecute. *See* 15 U.S.C. § 78dd-2, –3; *see also Clayco Petroleum Corp. v. Occidental Petroleum Corp.,* 712 F.2d 404, 409 (9th Cir.1983) (observing that DOJ has "discretion" in bringing enforcement actions and "[t]herefore, any governmental enforcement represents a judgment on the wisdom of bringing the proceeding, in light of the exigencies of foreign affairs"). The DOJ's authority includes the authority to investigate the facts, draw conclusions about whether prosecution is appropriate, and determine what penalties and conditions to impose in any settlement. *See* 28 U.S.C. § 547; 15 U.S.C. § 78dd-2, –3. U.S. Attorneys have the authority to settle FCPA claims asserted by United States. 28 C.F.R. §§ 0.160, 0.161. Additionally, the DOJ is authorized to issue opinions as to whether a prospective transaction would violate the FCPA. *See* 28 C.F.R. §§ 80.1, *et seq.* The DOJ also has the power to examine witnesses and to compel the production of

---

**5.** This Court has identified six factors for determining whether a governmental entity is functioning in a quasi-judicial capacity: (1) whether it has the power to exercise judgment and discretion; (2) whether it has the power to hear and determine or to ascertain facts and decide; (3) whether it has the power to make binding orders and judgments; (4) whether it has the power to affect the personal or property rights of private persons; (5) whether it has the power to examine witnesses, to compel the attendance of witnesses, and to hear the litigation of issues on a hearing; and (6) whether it has the power to enforce decisions or impose penalties. *Par-* *ker,* 647 S.W.2d at 695. Other courts have also adopted these six factors. *See, e.g., Perdue, Brackett, Flores, Utt & Burns,* 291 S.W.3d at 453; *Fiske v. City of Dallas,* 220 S.W.3d 547, 551 (Tex.App.-Texarkana 2007, no pet); *Alejandro v. Bell,* 84 S.W.3d 383, 391 (Tex. App.-Corpus Christi 2002, no pet.). A governmental agency "need not have all of the above powers to be considered quasi-judicial, but certainly the more of these powers it has, the more clearly is it quasi-judicial in the exercise of its powers." *See Parker,* 647 S.W.2d at 695; *see also Hernandez,* 931 S.W.2d at 651; *Shanks,* 169 F.3d at 994.

witnesses and other evidence. *See* 15 U.S.C. § 78dd–3(d)(2).

To the extent that the DOJ's investigative powers under the FCPA do not meet every element of the criteria for defining a quasi-judicial proceeding, that is primarily because the DOJ's determinations must ultimately be either proven in court or resolved through an agreement approved by a court. And that failure is not enough to disqualify the DOJ from acting in a quasi-judicial manner because, while "[a] governmental entity's power to decide a controversy presented by an allegedly defamatory statement is a key factor in determining whether the defamatory statement relates to the exercise of quasi-judicial power," it is not a necessary element. *See Perdue, Brackett, Flores, Utt & Burns,* 291 S.W.3d at 452.

Thus, even without the power to make final decisions, an agency proceeding may be deemed quasi-judicial when a statute confers upon the agency "the power to conduct investigations and hearings." *Reagan,* 166 S.W.2d at 913. The DOJ meets this test because it has the power to conduct investigations and here summoned Shell to meet and provide documents.

The absence of final decision-making authority was not conclusive in *Putter v. Anderson,* 601 S.W.2d 73, 77 (Tex.Civ. App.-Dallas 1980, writ ref'd n.r.e.). The court there concluded that the police department's internal affairs division exercised quasi-judicial power because it could investigate complaints received, determine whether the complaints were justified, and then make recommendations to the police chief or a disciplinary board for discipline. *Id.* The internal affairs division was not required to be empowered to mete out punishments itself in order to act in a quasi-judicial capacity. *Id.* The DOJ's authority under the FCPA is at least as great as that of the internal affairs division *in Putter. Id.*

Moreover, Shell met its burden of demonstrating that the statements were made during a quasi-judicial proceeding by presenting uncontroverted evidence that, although the DOJ had not yet initiated formal judicial proceedings directed at Shell at the time of Shell's statements, the DOJ had initiated formal judicial proceedings against other entities with whom Shell did business in connection with the questioned transactions and had initiated its own informal inquiry of Shell. Therefore quasi-judicial proceedings—proceedings which are often the only and final proceedings for FCPA violations—against Shell had commenced regardless of whether it had determined that formal judicial proceedings would be necessary. Specifically, Shell has presented evidence of the following facts about the DOJ's activities relating to potential FCPA violations by Shell and its employees during Shell's Bonga project in Nigeria:

- In February 2007 Vetco, an oil-field-services company that was a Shell contractor on the Bonga project, entered into a criminal plea agreement in which it agreed to pay a $26 million fine for illegally bribing Nigeria officials through a forwarding and customs clearance company.

- Before contacting Shell, the DOJ had begun investigating Panalpina, an investigation that eventually revealed that Vetco made its bribery payments to Nigerian custom officials through Panalpina for the purpose of facilitating the importation of materials for the Bonga project.

- Less than six months later, in July 2007, the DOJ's Criminal division, fraud section, informed Shell that it had "come to [the DOJ's] attention that [Shell] has engaged the services

of Panalpina, Inc.," a freight forwarding and customs clearing agent for Vetco, and "that certain of those services may violate the [FCPA]." In the letter, the DOJ requested a meeting with Shell in the DOJ's Washington, D.C. office to discuss the matter and requested that Shell collect certain date to provide to the DOJ at the meeting.

- Shell agreed during the meeting to investigate its dealings with Panalpina and to produce documents and information to the DOJ including information about Writt, who was a project manager responsible for approving reimbursement requests on the Bonga project and understood that the DOJ would conduct its own investigation for possible FCPA violations by Shell and its employees.

- In its July 17, 2007 letter, the DOJ specifically requested that Shell produce documents and information relating to Writt.

- Shell began its investigation in August 2007, using outside counsel, in-house counsel, accountants from KPMG, former FBI agents, and former law enforcement officers, and interviewing Writt during that month.

- Shell's investigation culminated in its February 5, 2009 report entitled Nigerian Customs Issues on the [Shell's] Bonga Project and in the Temporary Importation of Vessels into Nigerian waters "with the understanding that [it] would be treated confidentially."

- Shell Nigeria entered into a deferred prosecution agreement in November 2010 in which it acknowledged responsibility for its employees engaging in conduct violating the anti-bribery provision of FCPA. The terms of the agreement specifically state that the DOJ entered into this agreement in part because Shell Nigeria "cooperated with" the investigation, undertook remedial measures, "agreed to continue to cooperate with . . . any ongoing investigation" by the DOJ into potential violations of FCPA, and agreed to a $30 million fine.[6]

For all of these reasons, Shell's communications to the DOJ were made in contemplated or ongoing quasi-judicial proceedings and should be afforded the same privilege.

### Conclusion

The issue here is of extraordinary importance to the many international companies in Texas that face FCPA inquiries from the DOJ. Absolute privilege is recognized in limited circumstances because it creates a bright-line rule upon which witnesses may depend, thereby incentivizing witnesses to make expressions that may serve important public interests without fear of being subjected to civil litigation. Shell's statements here did not trigger or instigate a criminal investigation; they were part of Shell's communication to the DOJ reporting the results of its internal self-investigation and information gathering, spurred by the DOJ's request for information and cooperation in its ongoing investigation to determine whether and whom to prosecute for violations of the

---

6. Shell's evidence with respect to the DOJ's investigation and settlement of the FCPA case against Shell is largely uncontroverted. In his response to Shell's motion for summary judgment, Writt addressed Shell's privilege defense primarily on legal grounds. The only evidence he cited in this regard—an expert affidavit from a law professor who previously worked at the DOJ—related to whether the DOJ had "the final word on whether a crime ha[d] occurred."

FCPA. As such, they should be, and I believe under existing law are, absolutely privileged.

I therefore respectfully dissent.